MARY GREY ET AL. *v.* STAMFORD HEALTH
SYSTEM, INC., ET AL.
(SC 17679)

Borden, Palmer, Vertefeuille, Zarella and Sullivan, Js.

Argued January 11—officially released June 26, 2007

*Carey B. Reilly*, for the appellants (plaintiffs).

*Eric J. Stockman*, for the appellees (named defendant et al.).

*Charles W. Fleischmann*, with whom, on the brief, was *Garie J. Mulcahey*, for the appellees (defendant Stamford Radiology Associates, P.C., et al.).

*Opinion*

VERTEFEUILLE, J. This appeal[1] arises out of a medical malpractice action brought by the named plaintiff,

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Mary Grey,[2] against the defendants, Stamford Health
System, Inc. (Health System), Stamford Hospital (hospi-
tal), Stamford Radiology Associates, P.C. (Associates),
and Arnold Schwartz, a radiologist employed by Associ-
ates, alleging that Schwartz negligently interpreted a
mammogram that showed a suspicious lesion in the
plaintiff's left breast. The plaintiff claims on appeal that
the trial court improperly granted the defendants'
motions for summary judgment on the ground that the
action was barred by the governing statute of limita-
tions, General Statutes § 52-584.[3] Specifically, the plain-
tiff claims that the trial court improperly determined
that the statute of limitations had not been tolled under
the continuous treatment doctrine. We affirm the judg-
ment of the trial court.

The record, viewed in the light most favorable to the
plaintiff for purposes of reviewing the trial court's grant
of summary judgment, reveals the following facts and
procedural history. In February, 1994, Sherman Bull, a
physician, referred the plaintiff to the Diagnostic
Imaging Center of Stamford (Center) for tests because
a mammogram taken at a different facility in October,
1993, had shown "a small asymmetric density" in her
right breast. Schwartz, who was employed by Associ-
ates, interpreted mammograms for the Center. The Cen-
ter performed a mammogram of the plaintiff's right
breast, which Schwartz interpreted as normal. He stated

---

[2] Lee Grey, Mary Grey's husband, is also a plaintiff in this action, having
filed a claim for loss of consortium. For purposes of convenience, all refer-
ences to the plaintiff in this opinion are to Mary Grey.

[3] General Statutes § 52-584 provides in relevant part: "No action to recover
damages for injury to the person . . . caused by negligence . . . or by
malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital
or sanatorium, shall be brought but within two years from the date when
the injury is first sustained or discovered or in the exercise of reasonable
care should have been discovered, and except that no such action may be
brought more than three years from the date of the act or omission com-
plained of . . . ."

in his report that he believed that the suspicious condition in the initial mammogram "was merely superimposition of densities." Schwartz also recommended that the plaintiff receive a "six month follow-up [mammogram] with exaggerated craniocaudal and magnification views . . . to further assess stability." The plaintiff underwent additional mammograms of her right breast at the Center on August 2, 1994, March 23, 1995, and September 7, 1995. No suspicious medical conditions were detected in any of the mammograms. In his report on the March 23, 1995 mammogram, Schwartz recommended "[a] final six month follow-up . . . with magnification views of the right breast only before resuming annual mammography." In his report on the September 7, 1995 mammogram, he recommended "[a] routine bilateral follow-up . . . in March, 1996."

The plaintiff underwent bilateral mammograms at the Center on August 13, 1996, and August 6, 1997. Schwartz interpreted the mammograms as normal. He met personally with the plaintiff immediately after the 1997 mammogram and informed her that " '[e]verything was fine.' " On November 20, 1998, the plaintiff underwent another bilateral mammogram. Kristan D. Zimmerman, a radiologist employed by Associates, interpreted the mammogram and detected a "[s]uspicious irregular mass in the left upper/outer quadrant [of the left breast] for which a biopsy is needed." The plaintiff underwent a biopsy procedure on December 11, 1998, and was diagnosed with cancer of the left breast.

The plaintiff commenced this action on February 22, 2001,[4] alleging that Schwartz, acting as the "servant,

[4] If it is assumed that the continuous treatment doctrine does not apply in this case, the two year limitations period would have expired on August 6, 1999, two years after the last date of the alleged negligent conduct, and the repose period would have expired one year later on August 6, 2000. (We assume for purposes of this analysis that the date of the negligent conduct and the date of the plaintiff's discovery were the same, as the plaintiff makes no claim to the contrary in her brief to this court.) If it is assumed that the doctrine does apply, the two year limitations period would have expired

[agent], apparent [agent] and/or [employee]" of Health Systems, Associates and the hospital, negligently had failed to detect a suspected malignancy in the 1996 and 1997 mammograms. Thereafter, the defendants filed motions for summary judgment on the ground that the action was barred by § 52-584. The plaintiff objected to the motions on the ground, inter alia, that the statute of limitations was tolled under the continuous treatment doctrine.

The trial court concluded, inter alia, that the continuous treatment doctrine did not apply to Schwartz because, under the doctrine, the statute of limitations is tolled only until the cessation of treatment and Schwartz's treatment of the plaintiff had ceased on August 7, 1997. The trial court further concluded that, because the plaintiff's claims against Health Systems and the hospital were entirely derivative of her claims against Schwartz, the doctrine also did not apply to those defendants. With respect to Associates, the court concluded that the doctrine did not apply because each mammogram constituted a discrete treatment that ceased when the individual radiologist's interpretation was rendered to the treating physician. Accordingly, the trial court concluded that the action was barred by § 52-584 and granted the motions for summary judgment in favor of all of the defendants. This appeal followed.

with respect to all of the defendants on November 20, 2000, two years after the plaintiff's last contact with Associates. (It is arguable that, as to Schwartz, the limitations and repose periods would have expired, respectively, on August 6, 1999, two years after the plaintiff's last contact with that defendant and one year later on August 6, 2000. We express no opinion on that issue.) The plaintiff obtained a ninety day extension of the November, 20, 2000 expiration date pursuant to General Statutes § 52-190a (b), which expired on February 18, 2001. The plaintiff clams in her brief that she had until November 20, 2001, to bring her action under the three year repose period, thereby implying that she did not discover her injury until November 20, 1999, or later. She does not explain the basis for this claim. Because we conclude that the continuous treatment doctrine does not apply to any of the defendants, we need not consider whether the plaintiff's action would have been timely if the doctrine had applied.

The plaintiff claims on appeal that the trial court improperly determined that the continuous treatment doctrine did not apply under the circumstances of this case. With respect to Schwartz, she argues that the doctrine applies because, although she had no contact with him after the August 6, 1997 mammogram, she relied on his interpretation of that mammogram until her next mammogram in November, 1998. With respect to Associates, she argues that the doctrine applies because her involvement with it did not terminate until her last mammogram in November, 1998. With respect to Health Systems and the hospital, she argues that the doctrine applies because they are vicariously liable for the acts of both Schwartz and Associates. We conclude that, under the circumstances of this case, the doctrine does not apply to any of the defendants.

As a preliminary matter, we set forth the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant[s'] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 733, 873 A.2d 898 (2005).

We next review the law governing the statute of limitations on actions alleging health care malpractice. Section 52-584 requires such actions to be brought "within

two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered . . . ." The statute also establishes a repose period under which "no such action may be brought more than three years from the date of the act or omission complained of . . . ." "[T]he relevant 'date of the act or omission complained of,' as that phrase is used in § 52-584, is 'the date when the negligent conduct of the defendant occurs and . . . not the date when the plaintiff first sustains damage.' " *Blanchette* v. *Barrett*, 229 Conn. 256, 265, 640 A.2d 74 (1994).

"We have . . . recognized, however, that the statute of limitations, in the proper circumstances, may be tolled under the continuous treatment . . . doctrine, thereby allowing a plaintiff to commence his or her lawsuit at a later date." Id. As a general rule, "[t]he [s]tatute of [l]imitations begins to run when the breach of duty occurs. When the injury is complete at the time of the act, the statutory period commences to run at that time. When, however, the injurious consequences arise from a course of treatment, the statute does not begin to run until the treatment is terminated. . . . So long as the relation of physician and patient continues as to the particular injury or malady which [the physician] is employed to cure, and the physician continues to attend and examine the patient in relation thereto, and there is something more to be done by the physician in order to effect a cure, it cannot be said that the treatment has ceased. That does not mean that there must be a formal discharge of the physician or any formal termination of his [or her] employment. If there is nothing more to be done by the physician as to the particular injury or malady which he [or she] was employed to treat or if he [or she] ceases to attend the patient therefor, the treatment ordinarily ceases

without any formality." (Citation omitted; internal quotation marks omitted.) Id., 274–75.

The continuous treatment doctrine has been justified on a number of public policy grounds. First, we have recognized that "[i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury during a course of treatment." Id., 277. In such cases, "it is appropriate to allow the course of treatment to terminate before allowing the repose section of the statute of limitations to run, rather than having the parties speculate and quarrel over the date on which the act or omission occurred that caused the injury during a course of treatment." Id. Second, we have recognized that public policy favors "maintain[ing] the physician/patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure." (Internal quotation marks omitted.) Id., 276, quoting *Connell* v. *Colwell*, 214 Conn. 242, 253, 571 A.2d 116 (1990); see also *Nykorchuck* v. *Henriques*, 78 N.Y.2d 255, 258, 577 N.E.2d 1026, 573 N.Y.S.2d 434 (1991) ("[t]he doctrine rests on the premise that it is in the patient's best interest that an ongoing course of treatment be continued, rather than interrupted by a lawsuit, because 'the doctor not only is in a position to identify and correct his or her malpractice, but is best placed to do so' "); *Rizk* v. *Cohen*, 73 N.Y.2d. 98, 104, 535 N.E.2d 282, 538 N.Y.S.2d 229 (1989) (running statute of limitations from date of negligent act creates "a dilemma for the patient, who must choose between silently accepting continued corrective treatment from the offending physician, with the risk that his claim will be time-barred or promptly instituting an action, with the risk that the physician-patient relationship will be destroyed").[5]

---

[5] Cf. *Rosato* v. *Mascardo*, 82 Conn. App. 396, 402–408, 844 A.2d 893 (2004) (when plaintiff discovers injury prior to expiration of repose period, statute of limitations begins to run from date that plaintiff discovers injury, not

Many of our cases addressing the scope of the continuous treatment doctrine also involve the continuing course of conduct doctrine. See *Zielinski* v. *Kotsoris*, 279 Conn. 312, 321–23, 901 A.2d 1207 (2006); *Blanchette* v. *Barrett*, supra, 229 Conn. 273–75; *Connell* v. *Colwell*, supra, 214 Conn. 253. In the medical malpractice context, the continuing course of conduct doctrine requires the plaintiff to prove that "the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 370, 746 A.2d 753 (2000). "Although the continuing course of treatment and the continuing course of conduct doctrines are analytically separate and distinct, their relevance to any particular set of circumstances . . . may overlap." *Blanchette* v. *Barrett*, supra, 276. Because of this overlap, when plaintiffs have raised both doctrines in response to a statute of limitations defense and the evidence would support either one, we frequently have found it unnecessary to disentangle the doctrines and to specify which particular facts support which doctrine. See id., 279–80 (expert testimony supported finding under either doctrine); see also *Zielinski* v. *Kotsoris*, supra, 330 (finding no genuine issue of material fact as to whether statute of limitations was tolled under either doctrine).

In the present case, the plaintiff has raised only the continuous treatment doctrine in support of her claim that the action is not time barred and, at oral argument before this court, expressly disavowed any claim that

date that treatment terminated); compare *Ewing* v. *Beck*, 520 A.2d. 653, 663–64 (Del. 1987) (rejecting continuous treatment doctrine because, when patient has notice of specific act of negligent conduct but nevertheless permits ongoing treatment by defendant, tolling statute of limitations until termination of treatment would contravene legislative intent to limit right to bring medical malpractice action to absolute maximum of three years of date of negligence).

she was challenging the trial court's determination that the continuing course of conduct doctrine is inapplicable here. Accordingly, this case provides us with an opportunity to articulate the differences between the doctrines and to identify clearly each of the specific elements of the continuous treatment doctrine, as we previously have done with the continuing course of conduct doctrine in the medical malpractice context. See *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 370.

Our review of the decisions issued by this court and by courts of other jurisdictions establishes that, to establish a continuous course of treatment for purposes of tolling the statute of limitations in medical malpractice actions, the plaintiff is required to prove: (1) that he or she had an identified medical condition that required ongoing treatment or monitoring;[6] (2) that the defendant provided ongoing treatment or monitoring of that medical condition after the allegedly negligent conduct, or that the plaintiff reasonably could have anticipated that the defendant would do so;[7] and (3) that the plaintiff

---

[6] See *Zielinski* v. *Kotsoris*, supra, 279 Conn. 323 n.12 (statute of limitations is tolled so long as treatment for " 'particular injury or malady' " continues); *Blanchette* v. *Barrett*, supra, 229 Conn. 275 (same); *Nykorchuck* v. *Henriques*, supra, 78 N.Y.2d 259 ("[i]n the absence of continuing efforts by a doctor to treat a particular condition, none of the policy reasons underlying the continuous treatment doctrine justify the patient's delay in bringing suit"); *Watkins* v. *Fromm*, 108 App. Div. 2d 233, 244, 488 N.Y.S.2d 768 (1985) (continuous treatment doctrine applies only to "treatment for the same or related illnesses or injuries, continuing after the alleged acts of malpractice, not mere continuity of a general physician-patient relationship" [internal quotation marks omitted]).

[7] See *Zielinski* v. *Kotsoris*, supra, 279 Conn. 323 n.12 (statute of limitations is not tolled "[s]o long as . . . there is something more to be done by the physician in order to effect a cure" [internal quotation marks omitted]); *Blanchette* v. *Barrett*, supra, 229 Conn. 274 (same); id., 278 (to prevail on continuous treatment claim, plaintiff is required to produce evidence that some form of treatment continued beyond date of defendant's negligent conduct); *Connell* v. *Colwell*, supra, 214 Conn. 253–54 (when there was no evidence that defendant engaged in activity that could be construed as treatment of patient after date of last contact, there was no genuine issue

brought the action within the appropriate statutory period after the date that treatment terminated. As we previously have recognized, the determination that any of these elements exists is "conspicuously fact-bound." *Blanchette* v. *Barrett*, supra, 229 Conn. 276.

A comparison of the elements of the continuous treatment doctrine with the elements of the continuing course of conduct doctrine reveals that the primary difference between the doctrines is that the former focuses on the *plaintiff's* reasonable expectation that the treatment for an existing condition will be ongoing, while the latter focuses on the *defendant's* duty to the plaintiff arising from his knowledge of the plaintiff's condition. As we have indicated, the policy underlying the continuous treatment doctrine is to allow the plaintiff to complete treatment for an existing condition with the defendant and to protect the physician-patient relationship during that period. Accordingly, when the plaintiff had no knowledge of a medical condition and,

of material fact as to whether statute of limitations was tolled by continuous treatment doctrine); *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 523–24, 785 A.2d 234 (in absence of any evidence that defendant provided treatment for plaintiff after date of negligent conduct or that defendant had duty to do so, statute of limitations was not tolled under continuing course of conduct doctrine), cert. denied, 259 Conn. 902, 789 A.2d 990 (2001); *Young* v. *New York City Health & Hospitals Corp.*, 91 N.Y.2d 291, 693 N.E.2d 196, 670 N.Y.S.2d 169 (1998) (doctrine does not apply to routine periodic health examinations); *Allende* v. *New York City Health & Hospitals Corp.*, 90 N.Y.2d 333, 338–39, 683 N.E.2d 317, 660 N.Y.S.2d 695 (1997) (in absence of any evidence that plaintiff intended to seek ongoing treatment from defendant, policy considerations underlying continuous treatment doctrine have no application); *Rizk* v. *Cohen*, 73 N.Y.2d 98, 104, 535 N.E.2d 282, 538 N.Y.S.2d 229 (1989) ("where . . . [the] plaintiff did not seek corrective treatment and, in fact, allegedly did not even know that further treatment was necessary, there is no sound basis for applying the continuous treatment doctrine" because doctrine requires "continuing trust *on the plaintiff's part*" [emphasis in original]); id., 104–105 ("sound policy reasons suggest that mere doctor-initiated contact, in the absence of other objective factors indicative of a continuing relationship, should not fall under the continuous treatment doctrine").

therefore, had no reason to expect ongoing treatment for it from the defendant, there is no reason to apply the doctrine. See *Young* v. *New York City Health & Hospitals Corp.*, 91 N.Y.2d 291, 296, 693 N.E.2d 196, 670 N.Y.S.2d 169 (1998) ("[b]ecause a patient who is not aware of the need for further treatment of a condition is not faced with the dilemma that the doctrine is designed to prevent, the primary focus in determining whether the doctrine applies in a given case must remain on the patient"); see also footnote 7 of this opinion. In contrast, under the continuing course of conduct doctrine, if the defendant had reason to know that the plaintiff required ongoing treatment or monitoring for a particular condition, then the defendant may have had a continuing duty to warn the plaintiff or to monitor the condition and the continuing breach of that duty tolls the statute of limitations, regardless of whether the plaintiff had knowledge of any reason to seek further treatment. See *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 372 (defendant's suspicion of cancer at time of initial tests gave rise to continuing duty to warn, thereby triggering continuing course of conduct doctrine); *Blanchette* v. *Barrett*, supra, 229 Conn. 279 (when defendant had knowledge of plaintiff's breast condition, continuous failure to monitor condition triggered continuing course of conduct doctrine).

We recognize that we previously have suggested that a defendant's continuing duty to warn or to monitor the plaintiff's condition implicates the continuous treatment doctrine, even in the absence of any evidence that the plaintiff was aware that her condition required ongoing treatment or monitoring. In *Blanchette* v. *Barrett*, supra, 229 Conn. 280, this court stated that, when the defendant had knowledge of a suspicious breast condition, the "continuous failure to monitor . . . requires the application of the continuous treatment doctrine"; (citation omitted); even though the defendant

had told the plaintiff that "she was fine" and never advised her that her condition required repeat mammograms, follow-up examinations by the defendant or self-examination, and the plaintiff did not develop concerns that she might require additional treatment until more than two years after the negative diagnosis. See id., 268. We now recognize, however, that, in the absence of any evidence that the *plaintiff* reasonably expected that continuing treatment for a particular condition would be required, the policy considerations underlying the continuous treatment doctrine are not implicated and, therefore, the doctrine itself is not applicable. Thus, when only the *defendant* has knowledge of the need for additional treatment or monitoring, only the continuing course of conduct doctrine is implicated. To the extent that our decision in *Blanchette* suggested otherwise, it is hereby overruled.

Courts applying the continuous treatment doctrine also are required under the second prong of our newly articulated test to make the sometimes difficult determination as to whether the services provided by a medical practitioner constituted continuous treatment, to which the doctrine may apply, or, instead, constituted "separate and isolated contacts"; *Zielinski* v. *Kotsoris*, supra, 279 Conn. 328; to which the doctrine does not apply. Id. This question frequently arises in cases in which the defendant was not the plaintiff's primary treating physician, but, as in the present case, provided consultative diagnostic services. See id., 328–29 (citing cases). We concluded in *Zielinski* that, even when the plaintiff had sought ongoing treatment for her particular symptoms from her treating physician after receiving a false negative diagnosis from a radiologist, the diagnostic services did not constitute continuous treatment because the contacts with the defendant radiologists had been isolated and discrete.[8] See *Zielinski* v. *Kots-*

---

[8] We recognized in *Zielinski* that, when the plaintiff has presented evidence that the consulting diagnostician had concerns about a positive diagno-

*oris,* supra, 328 ("separate and isolated contacts with different physicians who have the same employer, especially in the context of consultative practices such as radiology, will not, without more, give rise to a continuing course of conduct or treatment relationship for purposes of tolling the statute of limitations").[9]

Our conclusion in *Zielinski* that the continuous treatment doctrine generally is inapplicable to providers of isolated and discrete consultative diagnostic services is consistent with the public policy underlying the doctrine. The doctrine reduces premature and unnecessary litigation by removing pressure on the patient to interrupt the patient-physician relationship before the treating physician, who is in a position to track the progress of the patient's particular condition and to make any

sis that he negligently failed to convey to the plaintiff, the statute of limitations might be tolled. See *Zielinski* v. *Kotsoris,* supra, 279 Conn. 330 (doctrine did not apply when plaintiff presented no evidence that defendants knew that diagnostic test indicated presence of tumor). We did not specify in *Zielinski* whether this evidence would support the application of the continuing course of conduct doctrine or the continuous treatment doctrine. As we have indicated, however, we now recognize that, when the inquiry focuses solely on the state of the defendant's knowledge of the plaintiff's condition, the continuing course of conduct doctrine, not the continuous treatment doctrine, is implicated.

[9] In support of this conclusion, we relied on several New York cases. See *Elkin* v. *Goodman,* 24 App. Div. 3d 717, 719, 808 N.Y.S.2d 405 (2005) (continuous treatment doctrine did not apply when neither plaintiff nor defendant anticipated successive magnetic resonance imaging (MRI) scans, treating physician independently analyzed MRI scans and defendant made no decisions as to plaintiff's treatment); *Sweet* v. *Austin,* 226 App. Div. 2d 942, 943–44, 641 N.Y.S.2d 165 (1996) (continuous treatment doctrine did not apply when there was no evidence of contact between plaintiff and defendant between successive computerized tomography (CT) scans or that further treatment after first CT scan was anticipated); *Noack* v. *Symenow,* 132 App. Div. 2d 965, 966, 518 N.Y.S.2d 495 (1987) (successive bone scans by radiologists who had no contact with patient aside from performance of procedure and taking of brief medical history did not constitute continuous treatment); see also *Elkin* v. *Goodman,* 285 App. Div. 2d 484, 486, 727 N.Y.S.2d 158 (2001) ("[g]enerally, where a diagnostic service, such as [that provided by radiologists], renders discrete, intermittent, medical services, this will not be considered continuous treatment").

needed corrections in the treatment, has had the opportunity to remedy any malpractice. *McDermott* v. *Torre,* 56 N.Y.2d 399, 408, 437 N.E.2d 1108, 452 N.Y.S.2d 351 (1982) (continuous treatment doctrine recognizes that attending physician is best placed to correct malpractice); see also *Walters* v. *Rinker,* 520 N.E.2d 468, 473 (Ind. App. 1988) (same). Both the patient, who is allowed to complete treatment without risking the right to bring a lawsuit, and the treating physician, who is allowed an opportunity to remedy the situation, benefit from this policy. A treating physician also is aware that, under the doctrine, he or she may be sued for malpractice only until the expiration of two years after the termination of treatment or cure and can order his or her affairs accordingly.

A provider of consultative diagnostic services, on the other hand, generally has no way of knowing after an incorrect diagnosis whether the patient's condition is improving or deteriorating and, therefore, has no reason to reconsider the diagnosis. Thus, the application of the doctrine to such providers would not allow the providers an opportunity to remedy any malpractice. See *McDermott* v. *Torre,* supra, 46 N.Y.2d 408 (policy underlying continuous treatment doctrine does not apply to independent laboratory because laboratory does not have ongoing relationship with patient or opportunity to discover error in laboratory report); *Walters* v. *Rinker,* supra, 520 N.E.2d 473 (same). Moreover, if the attending physician's ongoing treatment is imputed to such providers under the continuous treatment doctrine, they would have to assume that every diagnosis will be subject to the doctrine indefinitely, which would deprive them entirely of the repose and security that the statute of limitations is intended to provide. *Beebe* v. *East Haddam,* 48 Conn. App. 60, 67, 708 A.2d 231 (1998) ("the policy of statutes of limitation includes promoting repose by giving security and stabil-

ity to human affairs." [internal quotation marks omitted]).

In the present case, the parties produced evidence that the plaintiff initially sought treatment from the defendants when a mammogram appeared to reveal a suspicious condition in her right breast. Schwartz performed additional mammograms of the plaintiff's right breast for the specific purpose of determining whether there was any basis for concern and ultimately determined that the breast was normal. At that point, the series of enhanced mammograms of the right breast was terminated, and Schwartz recommended that the plaintiff follow a routine course of annual bilateral mammograms. It was during the course of these routine tests that Schwartz allegedly failed to detect the cancerous condition in the plaintiff's left breast.

Viewing this evidence in the light most favorable to the plaintiff, we conclude that the continuous treatment doctrine does not apply to the defendants as a matter of law. In light of the facts in *Zielinski*, it is clear that the continuous treatment doctrine is applicable to providers of consultative diagnostic services only in narrowly circumscribed circumstances.[10] In *Zielinski*,

---

[10] As we have indicated, if a defendant who provided diagnostic services had concerns about the initial test that he did not convey to the plaintiff, then the *continuing course of conduct* doctrine may be implicated. If *both* the consulting diagnostician and the plaintiff anticipate that the diagnostician will continue to monitor a specific medical condition, then the continuous treatment doctrine may apply. For example, in the present case, Schwartz recommended a series of six month follow-up examinations to monitor the suspicious condition in the plaintiff's right breast. If a misdiagnosis of that condition had occurred during that period, then the statute of limitations arguably would have been tolled until the completion of the last mammogram in the series.

It may be that the continuous treatment doctrine would also apply to a provider of consultative diagnostic services when the plaintiff has presented evidence that the provider had knowledge that the plaintiff continued to exhibit and to receive treatment for suspicious symptoms after a negative diagnosis or that the provider was involved continuously and actively in the treatment of a particular condition after the initial diagnosis. Because

although the true nature of the plaintiff's particular condition was unknown because of a false negative diagnosis, the plaintiff actually sought ongoing treatment for her condition from her treating physician. See *Zielinski* v. *Kotsoris*, supra, 279 Conn. 315–16. We concluded that the continuous treatment doctrine did not apply to the consulting radiologists who had provided the incorrect diagnosis in *Zielinski* because of the discrete nature of the plaintiff's contacts with the defendants. In the present case, there is even less justification for applying the doctrine. The plaintiff had no suspicious symptoms and was not receiving ongoing treatment from any physician for any particular breast condition.[11] Rather, the allegedly negligent conduct occurred during the course of a series of routine breast cancer diagnostic examinations associated with routine medical checkups.[12] Because routine periodic treat-

there is no such evidence in the present case, we need not consider that question.

[11] Even among the courts that have recognized the applicability of the continuous treatment doctrine to services provided by consultative diagnostic practitioners, many have held that, as in any case where the continuous treatment doctrine applies, the plaintiff must present some evidence that he or she was being treated or monitored continuously for a particular, existing medical condition and that he or she reasonably anticipated ongoing diagnostic tests in connection with such treatment. See *Elkin* v. *Goodman*, 285 App. Div. 2d 484, 486, 727 N.Y.S.2d 158 (2001) ("where . . . periodic diagnostic examinations are prescribed as part of ongoing care *for a plaintiff's existing condition* that are explicitly anticipated by physician and patient alike, the continuous treatment toll can apply even to a diagnostic laboratory" [emphasis added]); see also *Montgomery* v. *South County Radiologists, Inc.*, 49 S.W.3d 191, 195 (Mo. 2001) (when radiologists were providing diagnostic services for "the same complaint by the same patient about the same part of the body, three times within a nine-month period," genuine issue of material fact existed as to whether continuous treatment doctrine applied); *Fonda* v. *Paulsen*, 46 App. Div. 2d 540, 545, 363 N.Y.S.2d 841 (1975) (when evidence would support finding that plaintiff sought ongoing treatment for lesion that was later diagnosed as cancerous, notwithstanding pathologist's initial report that it was not cancerous, whether continuous treatment doctrine applied to pathologist was question of fact for jury).

[12] The plaintiff notes in her brief that the trial court "correctly state[d] that [her] mammograms were diagnostic as opposed to simply screening examinations." She apparently is referring to the court's statement that the

ment, by its very nature, has no natural termination point and cannot culminate in a cure, it does not implicate the public policy in favor of allowing the plaintiff to terminate a course of treatment before tolling the statute of limitations in order to avoid disputes over the date of the negligent conduct and to protect the physician-patient relationship until a cure is achieved. See *Young* v. *New York City Health & Hospitals Corp.*, supra, 91 N.Y.2d 296. If the continuous treatment doctrine applied in such cases, the exception would swallow the rule and the statute of limitations would be rendered a nullity.

The plaintiff points out that at least one court has held that providers of routine diagnostic screening tests may be subject to the continuous treatment doctrine. See *Bissell* v. *Papastavros' Associates Medical Imaging*, 626 A.2d 856, 864–65 (Del. 1993) (when defendant allegedly failed to detect presence of breast cancer in routine mammograms, genuine issue of material fact existed as to whether statute of limitations was tolled under continuous treatment doctrine). We continue to believe that the rule that we adopted in *Zielinksi* is the better one. The continuous treatment doctrine is not a broad remedial doctrine designed to ameliorate the

---

services provided by the defendants "involved the reading of diagnostic tests . . . ." The plaintiff has not explained, however, how routine diagnostic tests differ from routine screening tests for purposes of determining the applicability of the continuous treatment doctrine or, indeed, for any purpose. Our careful review of the evidence presented by the plaintiff in opposition to the defendants' motions for summary judgment, including the affidavit filed by the plaintiff's expert witness, Pamela Marcus, a physician specializing in diagnostic radiology, Marcus' deposition testimony, the plaintiff's affidavit, the plaintiff's deposition testimony and the mammogram reports prepared by Schwartz and Zimmerman, reveals no evidence that the mammograms that the plaintiff underwent in 1996, 1997 and 1998 were anything other than routine. Indeed, the report relating to the November 20, 1998 mammogram provided: "CLINICAL INFORMATION—Screening bilateral mammogram." In addition, the plaintiff herself referred to the annual mammograms as "screenings" in her deposition testimony.

harsh consequences of applying the statute of limitations to bar medical malpractice actions whenever a plaintiff has alleged reliance on a negligent misdiagnosis. Rather, the doctrine is rooted in specific, narrowly circumscribed policy concerns that involve the interests of both plaintiffs and defendants. If those concerns are not implicated—as they are not when, as the result of receiving a false negative diagnosis, the plaintiff had no reason to seek ongoing treatment for a particular condition—then the doctrine does not apply.

The plaintiff also claims that she had a special relationship with the defendants that gave rise to a continuing course of treatment. In support of this claim, she relies on our statement in *Zielinski* v. *Kotsoris*, supra, 279 Conn. 328, that "separate and isolated contacts with different physicians who have the same employer, especially in the context of consultative practices such as radiology, will not, *without more*, give rise to a continuing course of conduct or treatment relationship . . . ." (Emphasis added.) She points out that, in her affidavit in support of her objection to the defendants' motions for summary judgment, she stated that she "was knowledgeable about mammograms and their importance in screening for early detection of breast cancer. [She] had always been very conscientious in getting mammograms every year or more often if needed. [She] was a strong proponent of early detection and annual breast screenings. In 1998, [she] had worked for a federally funded program for the [s]tate of Vermont [h]ealth [d]epartment called 'Ladies First,' which was a breast screening program." She also stated in her affidavit that she continued to obtain mammograms from the defendants even after she moved to Vermont in 1995, because she wanted to maintain a direct relationship with them. In her brief, she states that, because "[i]t was of the utmost importance to [her] to have any breast abnormality, including cancer, diagnosed as early as possible," she "would immediately discuss her mammo-

grams with the radiologist reviewing her films after each study." The plaintiff argued at oral argument before this court that her particularly intense concern with early detection of breast cancer, and the defendants' knowledge of that concern, provided the something "more" required by *Zielinski* and gave rise to a continuous course of treatment. We disagree.

As we have indicated, under *Zielinski*, the continuous treatment doctrine will rarely apply to providers of consultative diagnostic services. Although we indicated in *Zielinski* that the statute of limitations might be tolled in such cases when a plaintiff presents evidence that the defendants had concerns about the existence of a medical condition that they negligently failed to convey to the plaintiff; see *Zielinski* v. *Kotsoris*, supra, 279 Conn. 330; such evidence would support the application of the continuing course of conduct doctrine, not the continuous treatment doctrine. We conclude that the something "more" that we required in *Zielinski* was this type of evidence, not the type of evidence pointed to by the plaintiff. Moreover, to apply the continuous treatment doctrine on the basis of the subjective intensity of the plaintiff's desire for an early, accurate diagnosis would be unworkable and inconsistent with the public policy of encouraging the same high standard of care for all patients.

The judgment is affirmed.

In this opinion the other justices concurred.