KAREN BEDNARZ *v.* EYE PHYSICIANS OF CENTRAL CONNECTICUT, P.C., ET AL.
(SC 17934)

Katz, Palmer, Zarella, Schaller and Jones, Js.

Argued March 14—officially released June 3, 2008

*Carey B. Reilly*, with whom were *Cynthia C. Bott* and, on the brief, *James D. Horwitz*, for the appellant (plaintiff).

*Lorinda S. Coon*, with whom was *David A. Haught*, for the appellee (defendant Peter G. Burch).

*Opinion*

KATZ, J. The plaintiff, Karen Bednarz, appeals from the summary judgment rendered in favor of the defendant Peter G. Burch[1] in her medical malpractice action. The plaintiff claims that the trial court improperly concluded that her action against the defendant was time barred because there were insufficient facts in dispute to toll the period of repose under General Statutes § 52-584.[2] Specifically, the plaintiff contends that there were disputed facts sufficient to warrant invocation of either the continuing course of conduct doctrine, the continuous course of treatment doctrine or equitable tolling. We agree with the plaintiff as to her claim regarding

---

[1] The plaintiff appealed from the trial court's summary judgment to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiff also had named as defendants in the underlying action Eye Physicians of Central Connecticut, P.C. (Eye Physicians), and William C. Hall, an ophthalmologist with Eye Physicians. The trial court's summary judgment pertained only to the plaintiff's claims against Burch. Therefore, for purposes of this appeal, we refer to Burch as the defendant.

[2] General Statutes § 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

the applicability of the continuing course of conduct doctrine and, accordingly, we reverse the judgment of the trial court and remand the case for further proceedings.

The record, viewed in the light most favorable to the plaintiff for the purposes of reviewing the granting of the motion for summary judgment, discloses the following facts and procedural history. On February 16, 1980, the plaintiff was referred to Eye Physicians of Central Connecticut, P.C. (Eye Physicians), an ophthalmology group, by her then treating ophthalmologist for purposes of evaluating puffiness in the area below her right eyebrow, which the ophthalmologist had noted on an insurance form as a possible tumor. The plaintiff's medical history noted in her records at Eye Physicians indicates that, when she was a young child, she had undergone surgery to remove a "watery mass" that left her with puffiness around her right eye. David Parke, one of the ophthalmologists at Eye Physicians, examined the plaintiff, noted in her medical records that the mass was a possible "lymphangioma"[3] or "hemangioma"[4] and referred her for various imaging tests, including X rays and a computerized axial tomography (CAT) scan. The plaintiff continued under the care of Eye Physicians until June, 2004, and, during that period, she was seen by various ophthalmologists in the group.

At all pertinent times prior to his retirement in June, 2000, the defendant was a practicing ophthalmologist with Eye Physicians. The defendant first treated the plaintiff in 1988; he became her ophthalmologist in 1990,

___

[3] A lymphangioma is defined as "[a] benign tumorlike mass of lymphatic vessels or channels that vary in size, are frequently greatly dilated, and are lined with normal endothelial cells." The American Heritage Stedman's Medical Dictionary (1995).

[4] A hemangioma is defined as "[a] congential benign skin lesion consisting of dense, usually elevated masses of dilated blood vessels." The American Heritage Stedman's Medical Dictionary (1995).

and regularly treated her until his retirement in June, 2000. Sometime in 2004, the plaintiff began to suffer seizures and memory loss. Tests ultimately revealed two meningiomas,[5] a form of benign brain tumors. The plaintiff thereafter obtained her medical records from Eye Physicians and first learned that the records disclosed that two meningiomas of her brain were detected in February, 1980.

On February 3, 2005, the plaintiff brought an action against the defendant, Eye Physicians and another ophthalmologist in the group. See footnote 1 of this opinion. With respect to the defendant, the plaintiff alleged that, commencing in or about 1994 and continuously until approximately April, 2004, the defendant had undertaken the treatment and monitoring of the plaintiff and that he had been negligent in his care during that time period in that he failed to: discuss with her the findings of the 1980 CAT scan showing the meningiomas in her brain and advise her; refer her to a neurologist or neurosurgeon; adequately and properly perform follow-up care; and repeat diagnostic testing. The plaintiff alleged that, as a result of the defendant's negligence, the meningiomas had grown, resulting in seizures, the need for anticonvulsive medications and future neurological surgical procedures, and the risk of injury to the optic nerve and stroke.

Thereafter, the defendant moved for summary judgment, asserting that, because he had not seen or spoken to the plaintiff after May, 1999, and had retired from the practice of medicine in 2000, more than four years before the plaintiff commenced the action against him, her action was time barred by the three year period

[5] More specifically, a meningioma is defined as "[a] slow-growing tumor of the meninges [the membranes covering the brain and spinal cord] often creating pressure and damaging the brain and adjacent tissues, occurring most often in adults." The American Heritage Stedman's Medical Dictionary (1995).

of repose under § 52-584. The plaintiff objected to the motion for summary judgment, claiming, inter alia, that her action was filed timely because the continuing course of conduct and continuing course of treatment doctrines tolled the period of repose under the statute of limitations.[6] In support of her objection, she submitted an affidavit attesting that, when she had obtained her records from Eye Physicians and learned for the first time that the meningiomas had been detected in 1980, one of the physicians in the practice with whom she spoke had stated that he did not know why " 'there had been no follow-up on this.' " In his supplemental reply, the defendant submitted an affidavit attesting that: the plaintiff had been a patient of Eye Physicians since 1980; she had been treated principally by Parke, until Parke's retirement; the defendant first had seen the plaintiff on January 26, 1988; he became her ophthalmologist on February 20, 1990, and remained as such until his retirement on June 30, 2000; and he had no knowledge of a CAT scan or other imaging that had been performed on the plaintiff in 1980 while she was Parke's patient. He further attested that he did not learn of the plaintiff's meningiomas until she commenced the present action against him. Therefore, the defendant claimed in his supplemental memorandum that, "there was no continuing duty where there was no knowledge of an undisclosed diagnosis" and that "any continuing duty ended when [he] retired from the practice of medicine."

The plaintiff filed a supplemental reply to address the defendant's assertion that he had been unaware of

---

[6] The plaintiff also had contended initially that the motion for summary judgment was premature because she had not yet had an adequate opportunity to conduct discovery, and there was some evidence that tended to call into question the defendant's contention that he had retired in June, 2000. The trial court delayed ruling on the defendant's motion until after the plaintiff conducted further discovery and apparently resolved any question as to the date of the defendant's retirement.

the plaintiff's meningiomas prior to the present action. She submitted as documentary support a copy of her medical records with Eye Physicians and the defendant, and an affidavit from Scott Soloway, a board certified ophthalmologist who had reviewed those records. Soloway specifically noted that these records included a report of a 1980 radiological study discussing the probable presence of two meningiomas and pointed to certain "handwritten medical records of a physician from [Eye Physicians] [that] indicate that [Eye Physicians] was aware of the probable meningiomas and of the need for further evaluation from February, 1980, forward." Soloway further attested that "[i]n caring for [the plaintiff], [the defendant] was required to be familiar with the medical records, including the presence of the meningiomas" and that, "[i]n fact, [the defendant's] medical records of April 5, 1993, May 3, 1994, May 16, 1995, May 27, 1997, and May 29, 1999, also included the medical records from 1980 and the report from 1980 reflecting the presence of the meningiomas." In his second supplemental reply memorandum in support of his motion for summary judgment, the defendant asserted that the continuing course of conduct doctrine did not apply in this case because "[t]here is no continuing duty to warn where there is no knowledge of the need to warn." The defendant further suggested that "[t]he lack of any reference in the record after 1980 suggests the possibility that the report had been misfiled." Because the defendant attested that he did not know that a CAT scan had been performed and had never seen the report showing the existence of the meningiomas, the defendant contended that he did not have the actual knowledge required to toll the repose period of § 52-584.

While the defendant's motion for summary judgment was pending, this court decided *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 203, 905 A.2d 1135 (2006), wherein we confirmed that the period of repose under § 52-

584 can be tolled by the continuing course of conduct doctrine only if the physician had actual knowledge of the prior wrong. Accordingly, before ruling on the defendant's motion, the trial court allowed the parties to file supplemental memoranda on the impact of that decision on the issue before it. The plaintiff asserted, inter alia, that there was a genuine issue of material fact as to whether the defendant knew about the meningiomas, in light of the contents of her medical records, the physician's comment when she obtained those records from Eye Physicians, and Soloway's statement that the report identifying the meningiomas contained the handwritten notes of a physician in the practice referencing the meningiomas. The plaintiff further asserted that, because *Neuhaus* did not address the continuing course of *treatment* doctrine, which also was applicable to her case, it had no impact on her cause of action under that doctrine. In support of her claim under that doctrine, the plaintiff contended that her continuous treatment by Eye Physicians could be imputed to the defendant despite his retirement in 2000.

The trial court concluded that neither the continuing course of treatment doctrine nor the continuing course of conduct doctrine was applicable to the facts of the case and, accordingly, rendered summary judgment in favor of the defendant. With regard to the continuous course of treatment doctrine,[7] the court made the fol-

[7] "When . . . the injurious consequences arise from a course of treatment, [the limitation period under § 52-584] does not begin to run until the treatment is terminated." (Internal quotation marks omitted.) *Zielinski* v. *Kotsoris*, 279 Conn. 312, 323, 901 A.2d 1207 (2006). "The determination of whether the physician-patient relationship has terminated depends upon several factors. These factors include the subjective views of the parties as to whether their relationship had terminated; the length of their relationship; the frequency of their interactions; the nature of the physician's practice; whether the physician had prescribed a course of treatment for or was monitoring the condition of the patient; whether the patient was relying upon the opinion and advice of the physician with regard to a particular injury, illness or medical condition; and whether the patient had begun to consult with another physician concerning the same injury, illness or medical condition."

lowing observations: the plaintiff was not treated by the defendant following his retirement but, rather, continued to be treated by other ophthalmologists at Eye Physicians; although she did not recall ever receiving a notice about the defendant's retirement and "therefore still considered him to be one of her physicians," there was no evidence that the plaintiff expected anything further from him; and finally, if she had an especially close relationship with the defendant like those that courts previously had recognized as supporting this doctrine, she reasonably should have noticed his absence. The trial court also remarked that it was proper to consider whether a reasonable patient at some point in time would have questioned someone at Eye Physicians about the results of her 1980 test.

In connection with the continuing course of conduct claim, the trial court, quoting *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 370, 746 A.2d 753 (2000), noted that, in the medical malpractice context, this doctrine requires the plaintiff to prove that "the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." (Internal quotation marks omitted.) The trial court determined that "[t]here is no dispute that a wrong was committed upon the plaintiff in [the present] case" in failing to discuss the results of the CAT scan with her. With respect to the second prong, the trial court was guided by the language in *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 203, under which "a continuing duty must rest on the factual bedrock of knowledge." (Internal quotation marks omitted.) The trial court noted the plaintiff's evidence that she had cited in her opposition to the defendant's motion for summary judgment but nevertheless determined that, although the defendant "should have known

---

*Blanchette* v. *Barrett*, 229 Conn. 256, 278, 640 A.2d 74 (1994).

about the report or at the very least should have seen the report," there was no evidence to suggest that the defendant had actual knowledge of the report. Accordingly, the trial court granted the defendant's motion for summary judgment. This appeal followed.

The plaintiff raises several issues regarding whether the trial court properly determined that the statute of limitations had not been tolled. With regard to the continuing course of conduct doctrine, because the trial court determined that there had been an initial wrong, the first element of the test for satisfying that doctrine, the plaintiff focuses primarily on the second element: whether there was a disputed issue of material fact as to whether the defendant owed a continuing duty to the plaintiff that was related to the alleged original wrong. Specifically, the plaintiff claims that the trial court improperly rejected the application of the continuous course of conduct doctrine based on its improper determination that the issue of whether the defendant had actual knowledge of the meningiomas was not in dispute. We agree with the plaintiff that, because she had presented evidence from which a jury reasonably could infer that the defendant had actual knowledge of the 1980 CAT scan and that the jury would not be required to credit the defendant's testimony to the contrary, there existed a genuine issue of material fact with respect to whether the period of repose under § 52-584 was tolled by the defendant's ongoing failure to warn the plaintiff. Accordingly, we conclude that it was improper for the trial court to have granted the defendant's motion for summary judgment as it related to the continuing course of conduct doctrine.[8]

[8] In light of this conclusion, we do not address the other theories on which the plaintiff predicates the application of the continuing course of conduct doctrine, namely, that the defendant had a continuing duty to review the plaintiff's medical records and that he had a "special relationship" with the plaintiff that would eliminate the need to prove actual knowledge of the meningiomas. Similarly, we do not reach the issue of whether the trial court properly rejected the equitable tolling doctrine. Because that doctrine is

With regard to the continuing course of treatment doctrine, the trial court stated that the plaintiff did not challenge the defendant's contentions that he had retired from the practice of medicine on July 1, 2000, and that there was no question that the last date he had treated her was on May 29, 1999. On the basis of those undisputed facts, the trial court determined that the doctrine did not apply. The plaintiff claims that the trial court's reliance on the defendant's retirement to conclude that the physician-patient relationship had terminated years before she had commenced the action was improper. We conclude that it was proper for the trial court to have concluded that the continuous course of treatment doctrine did not toll the statute.[9]

I

We begin with the well settled standard of review for reviewing a trial court's decision to grant a motion for summary judgment. "Practice Book § 384 [now § 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof

one to which the courts may resort when no other tolling doctrines are applicable; see *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 284, 777 A.2d 645 (2001); our favorable resolution of the plaintiff's claim under the continuing course of conduct doctrine eliminates the need in this case to address it.

[9] We recognize that, "[a]lthough the continuing course of treatment and the continuing course of conduct doctrines are analytically separate and distinct, their relevance to any particular set of circumstances . . . may overlap. . . . Because of this overlap, when plaintiffs have raised both doctrines in response to a statute of limitations defense and the evidence would support either one, we frequently have found it unnecessary to disentangle the doctrines and to specify which particular facts support which doctrine. See [*Blanchette* v. *Barrett*, 229 Conn. 256, 279–80, 640 A.2d 74 (1994)] (expert testimony supported finding under either doctrine); see also *Zielinski* v. *Kotsoris*, [279 Conn. 312, 330, 901 A.2d 1207 (2006)] (finding no genuine issue of material fact as to whether statute of limitations was tolled under either doctrine)." (Citation omitted; internal quotation marks omitted.) *Grey* v. *Stamford Health System, Inc.*, 282 Conn. 745, 753, 924 A.2d 831 (2007). This case, however, requires us to analyze the facts supporting the doctrines separately.

submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 368.

In reviewing the plaintiff's tolling claim, we also are guided by the law governing the statute of limitations on actions alleging health care malpractice. Section 52-584 requires such actions to be brought "within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered . . . ." The statute also establishes a repose period under which "no such action may be brought more than three years from the date of the act or omission complained of . . . ." General Statutes § 52-584. "[T]he relevant 'date of the act or omission complained of,' as that phrase is used in § 52-584, is 'the date when the negligent conduct of the defendant occurs and . . . not the date when the plaintiff first sustains damage.' " *Blanchette* v. *Barrett*, 229 Conn. 256, 265, 640 A.2d 74 (1994). "Therefore, an action commenced more than three years from the date of the negligent act or omission complained of is barred by the statute of limitations contained in § 52-584, regardless of whether the plaintiff had not, or in the exercise of [reasonable] care, could not reasonably have discovered the nature of the injuries within that time period."

*Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 369.

As we have recognized, however, in the proper circumstances, the statute of limitations may be tolled under the continuous conduct doctrine, thereby allowing a plaintiff to commence his or her lawsuit at a later date. Id. "In its modern formulation, we have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." (Internal quotation marks omitted.) *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 201–202.

"A comparison of the elements of the continuous treatment doctrine with the elements of the continuing course of conduct doctrine[10] reveals that the primary

---

[10] "[T]o establish a continuous course of treatment for purposes of tolling the statute of limitations in medical malpractice actions, the plaintiff is required to prove: (1) that he or she had an identified medical condition that required ongoing treatment or monitoring; (2) that the defendant provided ongoing treatment or monitoring of that medical condition after the allegedly negligent conduct, or that the plaintiff reasonably could have anticipated that the defendant would do so; and (3) that the plaintiff brought the action within the appropriate statutory period after the date that treatment terminated." *Grey* v. *Stamford Health System, Inc.*, 282 Conn. 745, 754–55, 924 A.2d 831 (2007). By contrast, to establish a continuous course of conduct,

difference between the doctrines is that the former focuses on the *plaintiff's* reasonable expectation that the treatment for an existing condition will be ongoing, while the latter focuses on the *defendant's* duty to the plaintiff arising from his knowledge of the plaintiff's condition. As we have indicated, the policy underlying the continuous treatment doctrine is to allow the plaintiff to complete treatment for an existing condition with the defendant and to protect the doctor-patient relationship during that period. Accordingly, when the plaintiff had no knowledge of a medical condition and, therefore, had no reason to expect ongoing treatment for it from the defendant, there is no reason to apply the doctrine. . . . In contrast, under the continuing course of conduct doctrine, *if the defendant had reason to know that the plaintiff required ongoing treatment or monitoring for a particular condition,* then the defendant may have had a continuing duty to warn the plaintiff or to monitor the condition and the continuing breach of that duty tolls the statute of limitations, regardless of whether the plaintiff had knowledge of any reason to seek further treatment. See *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 372 (defendant's suspicion of cancer at time of initial tests gave rise to continuing duty to warn, thereby triggering continuing course of conduct doctrine); *Blanchette* v. *Barrett*, supra, 229 Conn. 279 (when defendant had knowledge of plaintiff's breast condition, continuous failure to monitor condition triggered continuing course of conduct doctrine)." (Citations omitted; emphasis altered.) *Grey* v. *Stamford Health System, Inc.*, 282 Conn. 745, 755–56, 924 A.2d 831 (2007).

the defendant must have: "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 370.

## II

With regard to continuing course of conduct doctrine, this court's decision in *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 363, is instructive. That case involved a medical malpractice case wherein there was evidence that supported the plaintiff's claim that the defendant physician, "at the time of the diagnosis," had concern that his diagnosis was wrong or incomplete without further testing; id., 375; specifically, a note that the physician had written eleven years after his initial diagnosis, expressing his prior and continuing concern about the possibility of the plaintiff developing cancer. Id., 365. This court concluded that there existed a genuine issue of material fact as to whether the physician had a concern during the original course of treatment that never had been eliminated, thus suggesting the possibility that there had been an omission known to the physician contemporaneous to the original tort, and that the omission continued to be known to the physician after the fact. Id., 376; see also id., 372 ("[i]t is this concern of cancer that, if it existed at the time of his initial diagnosis, gave rise to the [physician's] continuing duty to warn, which in turn triggered the continuing course of conduct doctrine"). In short, in *Witt*, it was the physician's initial and continuing concern that had triggered his continuing duty to disclose, resulting in a tolling of the statute of repose contained in § 52-584. Id., 376.

In the present case, the plaintiff's contention that the defendant knew about the CAT scan results, thereby giving rise to a continuing duty, is premised on the following facts in evidence. Handwritten notes in the plaintiff's medical file, dated February 6, 1980, written by Parke, the physician who first had treated the plaintiff, indicated that she had been referred to Eye Physicians for a second opinion because the plaintiff's then treating ophthalmologist had a concern that she might

have a tumor. Parke's notes reveal that he had examined the plaintiff and ordered a base line X ray, and the plaintiff's medical records include a radiology report sent to Parke stating that the X ray results showed a "[p]robable large meningioma in the right frontal parietal region and a second one in the region of the right olefactory groove." The plaintiff's records further reflect that Parke thereafter sent the plaintiff for a cerebral blood flow study and a brain scan, which suggested "a right frontal subdural hematoma." The radiologist's report recommended further evaluation, including a CAT scan. The notes in the plaintiff's medical file next reflect that Parke sent the plaintiff to Yale-New Haven Hospital for a CAT scan, that, while conducting the CAT scan on February 25, 1980, the physicians at Yale-New Haven Hospital requested the plaintiff's other test results for comparative purposes, and that they ultimately diagnosed the plaintiff as having two meningiomas. The plaintiff's medical records further confirm that the defendant first saw the plaintiff on January 26, 1988; he thereafter became her treating ophthalmologist on February 20, 1990, remaining as such until his retirement on June 30, 2000. The records further reflect that the defendant saw the plaintiff approximately ten times during that time period, making notes in her file throughout the course of his treatment of her.

As we have noted previously, on the basis of his review of the aforementioned evidence in the plaintiff's medical file, Soloway stated in his affidavit that: Eye Physicians "was aware of the probable meningiomas and of the need for further evaluation from February, 1980, forward"; the defendant "was required to be familiar with the medical records, including the presence of the meningiomas"; the defendant's "medical records of April 5, 1993, May 3, 1994, May 16, 1995, May 27, 1997, and May 29, 1999, also included the medical records from 1980 and the report from 1980 reflecting the pres-

ence of the meningiomas"; and "[t]he standard of care imposes an initial and ongoing duty on [the defendant] to completely review the medical records of [the plaintiff]."[11]

On the basis of this evidence, the plaintiff maintains that there was sufficient direct and circumstantial evidence that, at *some* stage during the course of his long-standing treatment of her, the defendant had learned about the CAT scan results, and thus, that this knowledge gave rise to a continuing duty to advise the plaintiff, to refer her for further treatment, and to perform follow-up care. The defendant, by way of his self-serving affidavit, maintains that, despite both his ten year relationship with the plaintiff and the notes he made in her medical records pertaining to his treatment of her over the course of that time period, he did not have actual knowledge of the presence of the meningiomas. The defendant suggests that this denial was sufficient to demonstrate the absence of any genuine issue of material fact. We agree with the plaintiff that, based on the evidence she has produced, the defendant has not established that his claimed lack of knowledge of the plaintiff's condition was undisputed.

"To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent." (Internal

---

[11] The questions of whether the defendant had a duty to review the plaintiff's medical records thoroughly and whether his alleged failure to act in accordance with that duty operate as a basis upon which to assert a claim for negligence are not important to the resolution of the issue on appeal. Rather, for our purposes, Soloway's affidavit as it relates to that duty is significant in that it supports the plaintiff's assertion that there is a basis on which the jury reasonably could find that the defendant had actual knowledge of information contained in the file.

quotation marks omitted.) *Witt* v. *St. Vincent's Medical Center,* supra, 252 Conn. 372–73 n.7. On the basis of the medical records, Soloway's opinion and any reasonable inferences drawn therefrom, there was sufficient evidence upon which a jury reasonably could conclude that, despite his assertion to the contrary, the defendant actually knew of the CAT scan, thereby triggering the continuing course of conduct doctrine, but nevertheless failed to: discuss the CAT scan results with the plaintiff and advise her; refer her to a neurologist or neurosurgeon; adequately and properly perform follow-up care; and repeat diagnostic testing. The extent of knowledge sufficient to trigger these duties would be necessarily a matter of expert testimony, which the plaintiff will have the opportunity to present at trial. That is, whether the defendant *actually* knew about the 1980 CAT scan and was required by the standard of care to express that knowledge to the plaintiff, to advise her, to follow up, to make appropriate referrals and to repeat testing are facts that the plaintiff will have to prove to the jury at trial in order to *establish* that the continuing course of conduct doctrine applies. At this stage of the proceedings, however, the plaintiff needed only to refute the defendant's claim of lack of knowledge, which she did by demonstrating that there was a disputed issue of material fact as to whether the defendant owed a continuing duty to the plaintiff that was related to the alleged original wrong.

We therefore conclude that, on the basis of the materials presented to the trial court, there is a sufficient question of fact regarding the applicability of the continuing course of conduct doctrine so as to preclude summary judgment for the defendant. Accordingly, the trial court improperly granted the defendant's motion as to that doctrine.

## III

In addition to relying on the continuing course of conduct doctrine, the plaintiff asserted that the continuing course of treatment doctrine tolled the statute of limitations. See footnotes 7 and 10 of this opinion setting forth the continuing treatment factors. "As we have indicated, the policy underlying the continuous treatment doctrine is to allow the plaintiff to complete treatment for an existing condition with the defendant and to protect the doctor-patient relationship during that period." *Grey* v. *Stamford Health System, Inc.*, supra, 282 Conn. 755. The defendant contends that when, however, as in the present case, it is undisputed that the patient had no knowledge of her condition, the patient had no reason to expect ongoing treatment from her physician for that condition and there is no reason to apply the tolling doctrine. We conclude, however, that there is an even more fundamental barrier that the plaintiff in the present case did not overcome—the facts that her last contact with the defendant was on May 29, 1999, and that her last few yearly appointments thereafter were with another physician. See footnote 1 of this opinion.

Although we have recognized that treatment *may* continue after a patient's last personal visit with her physician, as when the physician's temporary unavailability has led to the patient's referral to another physician; *Blanchette* v. *Barrett*, supra, 229 Conn. 279; there was no evidence in the present case that, after July 1, 2000, the defendant intended to provide ongoing treatment or monitoring of the plaintiff or that the plaintiff reasonably could have anticipated that he would do so.[12]

---

[12] The plaintiff claims in the alternative that the treatment she received at Eye Physicians can be imputed to the defendant to toll the statute of limitations. Because this is a claim that the plaintiff did not make in the trial court, we do not address it. See *Konigsberg* v. *Board of Alderman*, 283 Conn. 553, 597 n.24, 930 A.2d 1 (2007) ("[w]e decline to review the plaintiffs' claim, raised for the first time in this appeal").

Although the plaintiff contends that she had a subjective belief to the contrary, that factor alone would not overcome the balance of the objective factors that the court must consider; see footnote 7 of this opinion; all of which reasonably demonstrate termination of their relationship. Accordingly, there is no evidence in the present case to suggest that there still existed a physician-patient relationship between the plaintiff and the defendant nearly four years after the defendant's retirement. The trial court, therefore, properly granted the defendant's motion for summary judgment as it pertained to the continuing course of treatment doctrine.

The judgment is reversed and the case is remanded for further proceedings.

In this opinion the other justices concurred.