PAOLA MARTINELLI *v.* STEFANO FUSI ET AL.
(SC 17988)

Norcott, Palmer, Vertefeuille, Zarella and Schaller, Js.

---

Argued October 23, 2008—officially released February 10, 2009

*Richard L. Grant*, with whom, on the brief, was *Anthony A. Piazza*, for the appellant (plaintiff).

*Michael G. Rigg*, with whom was *Hilary Fisher Nelson*, for the appellees (defendant Ronald H. Delfini et al.).

*Opinion*

NORCOTT, J. In this appeal, we consider whether the continuous course of conduct doctrine or the continuing treatment doctrine tolls the three year period of repose beyond the date on which a patient terminated the physician-patient relationship, when the physician was aware of test results that revealed the patient's need for follow-up treatment, but failed to notify the patient of those results because he did not subjectively believe that they revealed a need for further treatment. The plaintiff, Paola Martinelli, brought this action against the defendant Ronald H. Delfini,[1] alleging claims of dental malpractice and lack of informed consent.

---

[1] Delfini's professional corporation, Ronald Delfini, DDS, P.C., is also a defendant in this appeal. For convenience, however, hereafter references in this opinion to the defendant are to Delfini. The other defendants named in the underlying action, who are not parties to the present appeal, are Stefano Fusi and his principal, The Connecticut Center for Plastic Surgery.

The plaintiff appeals[2] from the trial court's grant of the defendant's motion for summary judgment on the ground that the plaintiff's claims were not timely filed within the three year period of repose under General Statutes § 52-584.[3] On appeal, the plaintiff claims that the trial court improperly granted the defendant's motion for summary judgment because there were genuine issues of material fact as to whether the period of repose was tolled by both the continuous course of conduct and the continuing treatment doctrines. We disagree, and accordingly, we affirm the judgment of the trial court.

The record, viewed in the light most favorable to the nonmoving plaintiff for purposes of reviewing the trial court's grant of summary judgment, reveals the following facts and procedural history. The plaintiff has suffered through a long history of dental difficulties, originally stemming from a childhood condition diagnosed as juvenile periodontitis. As a result of that condition, the plaintiff lost all of her teeth in 1977, which forced her to use dentures thereafter. Over the course of the next several years, the plaintiff experienced severe bone degradation in the bony ridges of her maxilla and mandible, to the point that they no longer could support her dentures.

---

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] General Statutes § 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

The plaintiff initially consulted with Stefano Fusi, a plastic surgeon; see footnote 1 of this opinion; and the defendant, a periodontist, regarding her condition in late 1992. Upon his initial examination of the plaintiff, the defendant determined that her deteriorating maxilla and mandible no longer could support her dentures, and he recommended surgical reconstruction to place implants into the plaintiff's maxilla. The defendant and Fusi performed the recommended surgery on December 28, 1993. Because of complications from that initial surgery, however, the plaintiff was required to undergo several follow-up surgical procedures, which were performed by the defendant and/or Fusi, on July 17, 1995, October 3, 1995, October 11, 1995, January 22, 1996, September 25, 1997, and March 26, 1999.

Following the last of these procedures, the plaintiff scheduled an appointment with the defendant in August, 1999, to discuss the continuing pain that she had been experiencing in her mouth and face. The defendant recommended that the plaintiff undergo a computerized tomography (CT) scan, which was performed on August 27, 1999. The CT scan revealed a perforation of the plaintiff's maxilla, a free floating piece of grafted bone in the left maxillary sinus, and sinus disease. The defendant received a copy of the radiology report detailing the results of the CT scan on August 30, 1999, but he did not discuss those results with the plaintiff because he believed that they did not reveal any condition that he would treat. The plaintiff subsequently consulted with the defendant regarding her condition on February 25, 2000, at which time the defendant again failed to notify her of the results of the CT scan or to discuss any possible follow-up treatment. In the wake of that final appointment, the plaintiff cancelled her next appointment with the defendant and terminated their relationship because of the multiple unsuccessful surgical procedures and the defendant's lack of respon-

siveness to her complaints. The plaintiff did not provide the defendant with any formal notice that she was terminating the relationship, but, rather, simply stopped seeing him. The defendant did not have any further contact with the plaintiff or any direct involvement in the plaintiff's treatment thereafter, although he continued to consult with Fusi regarding her implants until May 7, 2002.

After terminating her relationship with the defendant, the plaintiff consulted with several other physicians regarding her condition between February, 2000, and August, 2002, including Ronald Montano, a dentist. The plaintiff also sought continued treatment from Fusi, who performed his final surgery on the plaintiff on May 7, 2002. Both Montano and Fusi had copies of the CT scan, although neither ever told the plaintiff about the results of the CT scan or discussed possible treatment options based on those results. In June, 2002, the plaintiff consulted, however, with Neil Gordon, a physician, who for the first time alerted her to the results of the CT scan. The plaintiff thereafter consulted with another physician, Peter Constantino, who ordered another CT scan on August 9, 2002, which revealed little or no change in the plaintiff's condition from that which was revealed by the original CT scan.

The plaintiff commenced the present action on March 23, 2004, more than four years after her last meeting with the defendant, but less than two years after she first learned of the results of the CT scan. The plaintiff subsequently filed her second amended complaint, which is the operative pleading for the purposes of this appeal, on September 30, 2005, in which she alleges claims of, inter alia, dental malpractice and lack of informed consent against the defendant with respect to the multiple unsuccessful surgeries. The defendant filed an answer and special defense on March 30, 2006, denying liability and asserting that the plaintiff's claims

are barred by the two year statute of limitations and/ or the three year period of repose under § 52-584.

The defendant thereafter filed a motion for summary judgment, asserting that the plaintiff's claims are time barred under § 52-584. The trial court granted the defendant's motion, concluding that there were no genuine issues of material fact that could justify tolling the period of repose under either the continuous course of conduct or the continuing treatment doctrines, and that, as a consequence, the plaintiff's claims were time barred because they were filed more than three years after the defendant's allegedly negligent acts had occurred. Specifically, the court concluded with respect to the continuous course of conduct doctrine that there was no special relationship between the parties after February 25, 2000, and that, because the plaintiff "failed to introduce any evidence that indicates [that the defendant] had a concern about the pathology revealed by the August, 1999 CT scan or that he had actual knowledge the plaintiff was susceptible to an increased risk deriving from the August, 1999 CT scan . . . we are unable to impose a continuing duty on [him] related to the alleged wrong herein." Additionally, the court concluded that the continuing treatment doctrine "may have tolled the commencement of the statute of repose . . . until February [25], 2000," but "cannot toll the statute of repose in this matter beyond February [25], 2000, the date of the final consultation between the plaintiff and [the defendant]." The plaintiff subsequently filed a motion to reargue, claiming, inter alia,[4] that new evidence had been discovered regarding the defendant's continued involvement in her treatment after February 25, 2000, namely, that the defendant had

[4] The plaintiff also requested reargument on the ground that the trial court had improperly superimposed an "increased risk" element into the continuous course of conduct doctrine analysis. The trial court denied this aspect of the plaintiff's motion without discussion.

continued to consult with Fusi regarding her condition until May, 2002. Without substantial discussion, the trial court partially granted the plaintiff's motion, but denied the relief requested therein. This appeal followed.

On appeal, the plaintiff claims that the trial court improperly concluded that there were no genuine issues of material fact that could support the application of either the continuous course of conduct doctrine or the continuing treatment doctrine to toll the period of repose. Specifically, the plaintiff claims that: the defendant was aware of the results of the CT scan; he was under an ongoing duty to warn the plaintiff of those results and to recommend any necessary follow-up treatment; and his continuing breach of that duty triggered the continuous course of conduct doctrine and tolled the statute of repose until the plaintiff learned of those results in August, 2002. The plaintiff further claims that the continuing treatment doctrine tolled the period of repose because she reasonably could have anticipated that the defendant, who ordered the CT scan and received a report detailing the results of that CT scan, would communicate those results to her and recommend further treatment options within that time frame. Thus, the plaintiff contends that her claims are not time barred because the complaint was filed on March 23, 2004, less than two years from the date on which the period of repose began to run once either doctrine is applied. We address each claim in turn.

I

As a preliminary matter, we set forth "the well settled standard of review for reviewing a trial court's decision to grant a motion for summary judgment. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Internal quotation marks omitted.) *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, 287 Conn. 158, 168–69, 947 A.2d 291 (2008).

Our review of the plaintiff's claims is "also . . . guided by the law governing the statute of limitations on actions alleging health care malpractice. Section 52-584 requires such actions to be brought within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered . . . . The statute also establishes a repose period under which no such action may be brought more than three years from the date of the act or omission complained of . . . . [T]he relevant date of the act or omission complained of, as that phrase is used in § 52-584, is the date when the negligent conduct of the defendant occurs and . . . not the date when the plaintiff first sustains damage. . . . Therefore, an action commenced more than three years from the date of the negligent act or omission complained of is barred by the statute of limitations contained in § 52-584, regardless of whether the plaintiff had not, or in the exercise of [reasonable] care, could not reasonably have discovered the nature of the injuries within that time period." (Citations omitted; internal quotation marks omitted.) Id., 169.

We have recognized, however, that the statute of limitations and period of repose contained in § 52-584

may be tolled, in the proper circumstances, under either the continuous course of conduct doctrine or the continuing treatment doctrine, thereby allowing a plaintiff to bring an action more than three years after the commission of the negligent act or omission complained of. See, e.g., *Blanchette* v. *Barrett*, 229 Conn. 256, 265, 640 A.2d 74 (1994). "These doctrines share similar supporting rationales. The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied. Similarly, [t]he policy underlying the continuous treatment doctrine seeks to maintain the physician/patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure." (Internal quotation marks omitted.) Id., 276.

Despite the considerable similarities and overlap between the two doctrines, however, they are analytically separate and distinct, and the determination of whether to apply either doctrine in a given case is conspicuously fact bound. Id. Specifically, "the primary difference between the doctrines is that the [continuous treatment doctrine] focuses on the *plaintiff's* reasonable expectation that the treatment for an existing condition will be ongoing, while the [continuing course of conduct doctrine] focuses on the *defendant's* duty to the plaintiff arising from his knowledge of the plaintiff's condition. . . . Accordingly, when the plaintiff had no knowledge of a medical condition and, therefore, had no reason to expect ongoing treatment for it from the defendant, there is no reason to apply the [continuous treatment] doctrine. . . . In contrast, under the continuing course of conduct doctrine, if the defendant had reason to know that the plaintiff required ongoing treatment or monitoring for a particular condition, then the defendant may have had a continuing duty to warn the

plaintiff or to monitor the condition and the continuing breach of that duty tolls the statute of limitations, regardless of whether the plaintiff had knowledge of any reason to seek further treatment." (Citations omitted; emphasis in original.) *Grey* v. *Stamford Health System, Inc.*, 282 Conn. 745, 755–56, 924 A.2d 831 (2007).

## II

We begin with the plaintiff's first claim, namely, that the period of repose was tolled by the continuous course of conduct doctrine.[5] When presented with a motion for summary judgment under the continuous course of conduct doctrine, we must determine whether "there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 370, 746 A.2d 753 (2000). The parties do not appear to dispute that there is a genuine issue of material fact as to the first prong of the *Witt* test, namely, whether the defendant acted negligently in providing dental care for the plaintiff between 1993 and February 25, 2000. Accordingly, the plaintiff's appeal turns on our resolution of the second and third elements of that test.

With regard to the second prong, the plaintiff claims that there is a genuine issue of material fact as to

---

[5] The defendant claims that the plaintiff's representation to the court with regard to the continuing treatment doctrine that she was aware that she needed further treatment for her face and mouth renders her continuous course of conduct claim moot, because it would have been useless for him to warn her of something that she was already aware of. The plaintiff's general awareness of a need for continuing treatment did not, however, relate to any awareness of the specific conditions revealed by the CT scan. In fact, the evidence indicates that the plaintiff was not aware of those conditions until 2002, and that she would have benefited had the defendant warned her of them before that time. Accordingly, we conclude that this argument lacks merit.

whether the defendant had an ongoing duty to diagnose and treat the medical conditions revealed by the August, 1999 CT scan. Specifically, the plaintiff contends that she submitted evidence indicating that the defendant was aware of the results of the CT scan, and that public policy dictates that an ongoing duty should be imposed on the defendant because, as the physician who ordered that CT scan, he was in the best position to diagnose and treat the plaintiff's condition.[6] In response, the defendant contends that, although he was aware of the contents of the CT scan report, his mere knowledge of the plaintiff's physical characteristics as revealed by that report was insufficient to justify the imposition of an ongoing duty to diagnose and treat the plaintiff's condition. Rather, the defendant asserts that the plain-

---

[6] Additionally, the plaintiff claims that the trial court improperly denied her motion for reargument on the continuous course of conduct issue on the ground that it had superimposed an additional "increased risk" element into the analysis when the facts of the case indicated the existence of a fully manifested medical condition, as opposed to a mere risk of future harm. This argument lacks merit, however, because there is no indication in the trial court's memorandum of decision that an "increased risk" factor was in any way dispositive of the plaintiff's claim. Specifically, although the trial court indicated in its summary of the applicable law that "the plaintiff must submit evidence demonstrating that [the defendant] was aware of an increased risk to the plaintiff regarding the pathology discovered in the August, 1999 CT scan," it did so in reference to the legal standards set forth in *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 363, and *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 746 A.2d 730 (2000), both of which were decided in the context of whether the defendant was aware that the plaintiff's condition entailed an increased risk of future harm. In analyzing the specific facts of the present case, however, the trial court properly focused on whether the defendant had "a specific concern or actual awareness of a specific medical risk on the part of [the defendant]," or whether the defendant "had actual knowledge of a concern . . . relating to the plaintiff's condition . . . ." Moreover, in rejecting the plaintiff's continuous course of conduct claim, the trial court based its decision on its conclusion that "[t]he plaintiff has failed to introduce any evidence that indicates that [the defendant] had a *concern about the pathology revealed in the August, 1999 CT scan* or that he had actual knowledge the plaintiff was susceptible to an increased risk deriving from the August, 1999 CT scan." (Emphasis added.)

tiff was required to submit evidence demonstrating that he had a subjective concern or awareness that the conditions revealed by the CT scan actually required further treatment or warning. The defendant contends that the plaintiff did not submit any such evidence, and, therefore, that there is no genuine issue of material fact that could justify the imposition of a continuing duty in this case. We agree with the defendant.

In order to satisfy the second prong of the *Witt* test, the plaintiff must demonstrate that the defendant breached a duty related to the negligent act or omission complained of, which duty "remain[s] in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act."[7] (Internal quotation marks omitted.) *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 369–70. Moreover, when a defendant's subsequent wrongful conduct provides the basis for imposing an ongoing duty, we have concluded that such conduct "may include acts of omission as well as affirmative acts of misconduct." (Internal quotation marks omitted.) Id., 371.

We have also made clear, however, that the imposition of an ongoing duty under such circumstances "must rest on the factual bedrock of actual knowledge." (Internal quotation marks omitted.) *Neuhaus* v. *DeCholnoky*,

---

[7] The plaintiff does not claim that a special relationship existed between the parties after February, 2000. See footnote 17 of this opinion. Accordingly, in order for a continuing duty to be imposed on the defendant, the plaintiff was required to submit evidence that the defendant engaged in subsequent wrongful conduct related to the initial wrong complained of.

280 Conn. 190, 203, 905 A.2d 1135 (2006). More specifi-
cally, we have stated that "we disagree with the premise
that a physician who has performed a misdiagnosis
has a continuing duty to correct that diagnosis in the
absence of proof that he subsequently learned that his
diagnosis was incorrect. While there may be instances
in product liability situations where a continuing duty
to warn may emanate from a defect, without proof that
the manufacturer actually knew of the defect . . . the
same principle does not apply to a physician's misdiag-
nosis. To apply such a doctrine to a medical misdiagno-
sis would, in effect, render the repose part of the statute
of limitations a nullity in any case of misdiagnosis."
(Citations omitted.) *Blanchette* v. *Barrett*, supra, 229
Conn. 284. Thus, the heightened "actual knowledge"
requirement reflects the fact that, although a defen-
dant's ongoing failure to warn of or properly diagnose
a plaintiff's medical condition may be wrongful, the
legislature has made a clear public policy choice that,
"after the lapse of a reasonable time, [defendants in
medical malpractice cases should be able] to plan their
affairs with a reasonable degree of certainty, free from
the disruptive burden of protracted and unknown
potential liability . . . ." (Internal quotation marks
omitted.) *Neuhaus* v. *DeCholnoky*, supra, 224. In the
absence of any evidence indicating the defendant's
actual knowledge of the need for further warning, treat-
ment or monitoring of the plaintiff's condition,[8] there-

---

[8] We note that the "actual knowledge" requirement focuses not merely
on the defendant's knowledge of the plaintiff's physical characteristics them-
selves; see *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, supra,
287 Conn. 172–75; but also on the defendant's awareness that those charac-
teristics reveal a significant medical risk or condition that requires further
treatment, monitoring or warning. See *Neuhaus* v. *DeCholnoky*, supra, 280
Conn. 205; *Blanchette* v. *Barrett*, supra, 229 Conn. 284; *Nieves* v. *Cirmo*, 67
Conn. App. 576, 586, 787 A.2d 650, cert. denied, 259 Conn. 931, 793 A.2d
1085 (2002); *Hernandez* v. *Cirmo*, 67 Conn. App. 565, 571–72, 787 A.2d 657,
cert. denied, 259 Conn. 931, 793 A.2d 1084 (2002). Accordingly, we agree
with the defendant's contention that, in addition to presenting evidence of
the defendant's knowledge of the CT scan report itself, the plaintiff was

fore, we have declined to frustrate that valid policy choice by imposing a continuing duty on the defendant, and thereby tolling the statute of limitations. See id., 208–209; see also *Nieves* v. *Cirmo*, 67 Conn. App. 576, 587, 787 A.2d 650 ("to expect a defendant physician to remedy a diagnosis in the absence of proof that he subsequently learned that his diagnosis was incorrect would render the repose part of the statute of limitations a nullity" [internal quotation marks omitted]), cert. denied, 259 Conn. 931, 793 A.2d 1085 (2002); *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 529, 785 A.2d 234 ("to expect a pathology group to provide follow-up treatment or to instruct a patient on follow-up care after a negative diagnosis when there is no awareness that the diagnosis is wrong and there is no ongoing relationship is beyond the expectation of public policy"), cert. denied, 259 Conn. 902, 789 A.2d 990 (2001).

Accordingly, the plaintiff was required to submit evidence demonstrating that the defendant was actually aware that the conditions revealed by the CT scan were such that further treatment or monitoring was required. The evidence relied upon by the plaintiff in this regard includes: (1) the CT scan report, which the parties do not dispute was received and reviewed by the defendant; (2) an expert affidavit from Robert Friedman, a dentist, opining that the CT scan revealed a condition that required further treatment, and that the defendant had deviated from the standard of care by not discussing the results of the CT scan with the plaintiff or recommending appropriate treatment options; and (3) an expert affidavit from Howard Twersky, an oral surgeon, which averred that the CT scan revealed a condition

required to submit evidence demonstrating that the defendant was actually aware or had a concern that the physical characteristics revealed by that report entailed a medical risk or condition that required further treatment, warning or monitoring.

that should have been treated in a timely manner, and that it was a deviation from the standard of care for the plaintiff's condition to go untreated from August 30, 1999, until May, 2002. In response, the defendant points us to his deposition testimony[9] and affidavit,[10] in which he stated his belief that the CT scan did not reveal a condition that he would be concerned about, or for which he would recommend further treatment, and that at no time did he become aware that his initial assessment of the plaintiff's condition was incorrect.

Our review of those cases in which we have discussed the imposition of a continuing duty on the defendant leads us to conclude that this evidence was insufficient to create a genuine issue of material fact that the defendant had actual knowledge of the need to provide further treatment or monitoring of the plaintiff's condition.

[9] The plaintiff claimed at oral argument before this court that, because the defendant at times characterized his assessment of the plaintiff's condition as being such that he, *as a periodontist*, would not have treated it, such a belief does not indicate that the defendant was unaware that other *nonperiodontal* physicians would treat it. Although we agree with the plaintiff that the defendant could not necessarily escape liability simply by claiming that a periodontist would not treat the condition if he was aware that it should be referred to a nonperiodontist for treatment, we conclude that the defendant's deposition responses were not specific to periodontists. Indeed, the defendant stated on at least three occasions that he would not have treated the conditions revealed by the CT scan, without any reference to his specialty as a periodontist.

More importantly, even if we were to interpret the defendant's responses as being specific to a periodontist, it was the plaintiff's burden to establish that the defendant had actual knowledge of the need for further treatment by another medical provider. Despite having had ample opportunity to do so, however, the plaintiff never asked the defendant whether he was aware that a nonperiodontist would in fact treat the condition, and there is no other indication in the record to suggest that that was the case. In the absence of such evidence, we cannot simply assume that, as a periodontist, the defendant was actually aware that another physician with a different specialty would have treated the plaintiff's condition.

[10] Specifically, the defendant stated in his affidavit that "[a]t no point during the course of my treatment of the plaintiff from 1992–2000 did I suspect that any diagnosis or treatment of the plaintiff's condition by either myself or . . . Fusi was incorrect or inappropriate."

Specifically, in all of those cases in which we have imposed a continuing duty on the defendant in the absence of an ongoing physician-patient relationship, the plaintiff had submitted at least some subjective evidence that the defendant *was actually aware* of the requisite underlying facts. See *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, supra, 287 Conn. 172–75 (evidence of numerous references in plaintiff's medical file to concern of previous physicians and defendant's employer that plaintiff had tumor, combined with expert testimony that defendant would have reviewed that file, sufficient to create issue of fact as to defendant's knowledge of tumor); *Witt* v. *St. Vincent's Medical Center*, supra, 252 Conn. 372 (defendant's treatment note indicating initial concern that plaintiff had cancer sufficient to give rise to continuing duty to warn); *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 197–99, 746 A.2d 730 (2000) (evidence that defendant knew blood used in transfusion could have been contaminated with human immunodeficiency virus and had not been tested, and expert testimony that defendant should have warned plaintiff of risk of infection, sufficient to create continuing duty to warn). By contrast, our courts have refused to impose a continuing duty on the defendant when the only evidence demonstrating his or her actual knowledge is in the form of expert testimony that the defendant *should have been aware* of the those facts, or that he or she deviated from the standard of care.[11] See *Neuhaus* v. *DeCholnoky*, supra,

[11] Indeed, we emphasized in *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 214–15, that, were we to impose a continuing duty based solely on objective expert testimony, "a plaintiff in a misdiagnosis case . . . would be able to frustrate the statute of repose under § 52-584 simply by retaining an expert who is willing to say that the [defendant deviated from the standard of care]. Such an approach would require a defendant to bear the expense of a defense, the risk of litigation, and the possibility of lost witnesses and evidence, regardless of how many years before suit the alleged misconduct may have occurred. As our courts have noted, this type of ongoing exposure is exactly what the legislature sought to avoid in establishing the three year statute of repose in § 52-584."

280 Conn. 205, 211 n.15; *Nieves* v. *Cirmo*, supra, 67 Conn. App. 580, 587; *Hernandez* v. *Cirmo*, 67 Conn. App. 565, 570–71, 787 A.2d 657, cert. denied, 259 Conn. 931, 793 A.2d 1084 (2002); *Golden* v. *Johnson Memorial Hospital, Inc.*, supra, 66 Conn. App. 529–30.

Similar to those cases in which our courts have declined to impose a continuing duty on the defendant, the only evidence relied upon by the plaintiff in the present case to demonstrate the defendant's actual awareness that the plaintiff's condition required further treatment or monitoring was the expert affidavits of Friedman and Twersky, in which they opined that the defendant deviated from the objective standard of care by failing to diagnose, disclose and treat the conditions revealed by the CT scan. Although such evidence may indicate that the defendant's failure to act was negligent, it does not indicate that the defendant was actually aware that the plaintiff's condition required further treatment, such that an ongoing duty to diagnose and treat that condition could be imposed.[12] The plaintiff

---

[12] We acknowledge that our conclusions herein may potentially require a plaintiff to find evidence of the proverbial "smoking gun" in order to prevail under the continuous course of conduct doctrine. Although this may be a difficult task depending on the particular facts of the case, the legislature has made a clear and unambiguous policy choice that a defendant in medical malpractice cases may not be subject to liability beyond the three year period of repose, and that policy choice "should be respected in all but the most exceptional circumstances . . . ." (Citation omitted; internal quotation marks omitted.) *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 207. We conclude that the mere suggestion that a defendant's failure to act was negligent does not give rise to such exceptional circumstances.

Moreover, we emphasize that our conclusion that a plaintiff may not rely exclusively on objective expert evidence to establish the defendant's actual knowledge will not necessitate the existence of smoking gun evidence in all cases. Indeed, there may well be circumstances in which the facts of the case are so egregious that an expert would be willing to testify that no reasonable physician in the defendant's position could have lacked such knowledge, and, therefore, that the defendant *must have known* that the plaintiff's condition posed a serious medical risk. Such testimony properly may put into question the credibility of the defendant's self-serving statements to the contrary, and thereby create a genuine issue of material fact that the defendant owed a continuing duty to treat the plaintiff's condition.

did not submit any other evidence to indicate that the defendant subjectively ever knew or had a concern that his initial diagnosis was incorrect,[13] and in the absence of such evidence we are unwilling to contravene the legislature's clear policy choice by imposing a continuing duty on the defendant and tolling the period of repose. Accordingly, we conclude that the trial court properly determined that the continuous course of conduct doctrine did not toll the period of repose in this case.

## III

We next address the plaintiff's second claim, namely, that the period of repose was tolled by the continuing treatment doctrine. In order "to establish a continuous course of treatment for purposes of tolling the statute of limitations in medical malpractice actions, the plaintiff is required to prove: (1) that he or she had an identified medical condition that required ongoing treatment or monitoring; (2) that the defendant provided ongoing treatment or monitoring of that medical condition after the allegedly negligent conduct, or that the plaintiff

We conclude, however, that such evidence is not before us in the present case. Friedman and Twersky merely stated their belief that the defendant had deviated from the standard of care, without any indication that the CT scan report revealed a condition that was so serious and obvious that the defendant must have known that further treatment was required. Moreover, the fact that the plaintiff's condition allegedly went untreated for more than two years, despite the fact that the plaintiff consulted with Fusi and Montano during that time, both of whom had copies of the CT scan, implies that the plaintiff's condition was not so serious that the defendant must have known that further treatment was required.

[13] Although the defendant continued to consult with Fusi until May, 2002, regarding the plaintiff's implants, that fact does not demonstrate that the defendant was aware that the specific conditions revealed by the CT scan required further treatment. There is no evidence in the record as to the specific content of such consultations, or that the CT scan was meaningfully discussed during those consultations, much less that it raised a serious concern for either physician. Indeed, the fact that the plaintiff claims that Fusi did not treat her conditions at all indicates that neither he nor the defendant were concerned about the results of the CT scan.

reasonably could have anticipated that the defendant would do so; and (3) that the plaintiff brought the action within the appropriate statutory period after the date that treatment terminated." *Grey* v. *Stamford Health System, Inc.*, supra, 282 Conn. 754–55. The plaintiff contends that the facts of the present case satisfy the test in *Grey* because: (1) the surgical complications revealed by the August 30, 1999 CT scan represented an identified medical condition that required ongoing treatment or monitoring; (2) she reasonably could have anticipated that the defendant, as the physician who had ordered that CT scan, would communicate the results to her and recommend treatment options, but that he failed to do so; and (3) she brought the present action on March 23, 2004, less than three years after the defendant's ongoing treatment was ended by her discovery of and subsequent treatment for the condition disclosed by the CT scan. In response, the defendant does not appear to dispute the plaintiff's claims as to the first and third prongs of the test, but, rather, contends that the plaintiff has not satisfied the second prong of the test because she has not submitted any evidence to indicate the existence of an ongoing physician-patient relationship, or that the defendant provided any treatment of the plaintiff's condition after February 25, 2000. We agree with the defendant.

We have previously recognized that the continuing treatment doctrine rests on the premise that we should "[seek] to *maintain the physician/patient relationship* in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure." (Emphasis added; internal quotation marks omitted.) *Connell* v. *Colwell*, 214 Conn. 242, 253, 571 A.2d 116 (1990). Thus, the doctrine exists to reduce "premature and unnecessary litigation by removing pressure on the patient to interrupt the patient-physician relationship before the treating physi-

cian, who is in a position to track the progress of the patient's particular condition and to make any needed corrections in the treatment, has had the opportunity to remedy any malpractice." *Grey* v. *Stamford Health System, Inc.*, supra, 282 Conn. 758–59. Accordingly, "[w]hen the injury is complete at the time of the act, the statutory period commences to run at that time. When, however, the injurious consequences arise from a course of treatment, [the continuing treatment doctrine may toll the statute] until the treatment is terminated. . . . *So long as the relation of physician and patient continues as to the particular injury or malady which [the physician] is employed to cure, and the physician continues to attend and examine the patient in relation thereto*, and there is something more to be done by the physician in order to effect a cure, it cannot be said that the treatment has ceased. That does not mean that there must be a formal discharge of the physician or any formal termination of his [or her] employment. If there is nothing more to be done by the physician as to the particular injury or malady which he [or she] was employed to treat *or if he [or she] ceases to attend the patient therefor*, the treatment ordinarily ceases without any formality." (Citation omitted; emphasis added; internal quotation marks omitted.) *Blanchette* v. *Barrett*, supra, 229 Conn. 274–75.

Furthermore, in parsing out the differences between the continuous course of conduct and continuing treatment doctrines, we recently concluded in *Grey* v. *Stamford Health System, Inc.*, supra, 282 Conn. 755, that the latter "focuses on the *plaintiff's* reasonable expectation that the treatment for an existing condition will be ongoing . . . ." (Emphasis in original.) Accordingly, in defining the requirements of the continuing treatment test in *Grey*, we concluded that the second prong of that test may be satisfied if the plaintiff could show that "the defendant provided ongoing treatment or mon-

itoring of [the plaintiff's] medical condition after the allegedly negligent conduct, or that the plaintiff reasonably could have anticipated that the defendant would do so . . . ." Id., 754–55. The plaintiff relies on the second clause of that sentence to claim that, because the defendant ordered the CT scan, was aware of its results, and was in the best position to advise her of those results, she reasonably could have expected that he would in fact do so.[14] We conclude that such reliance is misplaced.

In rejecting the plaintiff's claim that the continuing treatment doctrine tolled the statute of limitations in *Grey*, we expounded on the differences between the continuing treatment and continuous course of conduct doctrines. See id., 752–57. In particular, we stated that, when a plaintiff has a medical condition for which the defendant is providing ongoing treatment or monitoring, "when the plaintiff ha[s] no knowledge of [that] medical condition and, therefore, ha[s] no reason to expect ongoing treatment for it from the defendant,

---

[14] We note that the plaintiff does not extensively rely on the first clause of the second prong of the test in *Grey*, which states that that prong may be satisfied if "the defendant provided ongoing treatment or monitoring of [the plaintiff's] medical condition after the allegedly negligent conduct . . . ." *Grey* v. *Stamford Health System, Inc.*, supra, 282 Conn. 754. Indeed, the only evidence indicating that the defendant continued to be involved in the plaintiff's treatment after their final meeting on February 25, 2000, was Fusi's deposition testimony, in which he stated that he had continued to consult with the defendant about the plaintiff's implants until 2002. Although we are not persuaded that such consultations properly can be considered continuing treatment; see id., 760 ("it is clear that the continuous treatment doctrine is applicable to providers of consultative . . . services only in narrowly circumscribed circumstances"); *Zielinski* v. *Kotsoris*, 279 Conn. 312, 328, 901 A.2d 1207 (2006) (isolated and discrete consultative services "will not, without more, give rise to a . . . treatment relationship for purposes of tolling the statute of limitations"); we conclude that any reliance on such conduct to trigger the continuing treatment doctrine is misplaced because the plaintiff was not aware that the defendant had engaged in such consultations until Fusi was deposed on May 24, 2007. See *Grey* v. *Stamford Health System, Inc.*, supra, 755–56.

there is no reason to apply the doctrine." Id., 755–56. That is so because the underlying policy rationale supporting the doctrine, namely, "to allow the plaintiff to complete treatment for an existing condition *with the defendant* and to protect the [*physician*]-*patient relationship* during that period," is not implicated under such circumstances. (Emphasis added.) Id., 755. Thus, our emphasis in *Grey* regarding the plaintiff's reasonable expectation of further treatment was made in a context in which an ongoing physician-patient relationship was presumed. When no such relationship exists, however, or when the defendant is not engaged in an ongoing course of treatment or monitoring that was explicitly anticipated by both parties even after the termination of such a relationship, we have concluded that the doctrine does not apply regardless of whether the plaintiff had a subjective expectation that further treatment or monitoring would in fact be provided.[15] See *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, supra, 287 Conn. 176–77.[16] Indeed, we do not see how the policy justifications underlying the doctrine could be furthered when a plaintiff does not seek further treatment from a particular defendant, that defendant has ceased to provide any such treatment, and there is no physician-patient relationship to protect.

---

[15] We recognized in *Bednarz* that, although a plaintiff's subjective expectation that the defendant would provide further treatment is relevant to the determination of whether a physician-patient relationship existed, that factor alone is insufficient to trigger the continuing treatment doctrine. See *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, supra, 287 Conn. 177.

[16] See also *Allende* v. *New York City Health & Hospital Corp.*, 90 N.Y.2d 333, 338, 683 N.E.2d 317, 660 N.Y.S.2d 695 (1997) (one element of doctrine is that further treatment, most often in form of regularly scheduled appointment for near future, is explicitly anticipated by both parties); id., 339 (policies underlying doctrine not implicated when plaintiff no longer had faith or trust in defendant, or intent to seek further treatment from defendant); *Nykorchuck* v. *Henriques*, 78 N.Y.2d 255, 259, 577 N.E.2d 1026, 573 N.Y.S.2d 434 (1991) ("[i]n the absence of continuing efforts by a [physician] to treat a particular condition, none of the policy reasons underlying the continuous treatment doctrine justify the patient's delay in bringing suit").

Accordingly, the plaintiff was required, at the very least, to submit evidence demonstrating the existence of an ongoing physician-patient relationship with the defendant with respect to the particular malady complained of, or that she was aware that the defendant was engaged in conduct that could be considered ongoing treatment despite the lack of such a relationship. We conclude, however, that the evidence submitted by the plaintiff is to the contrary. Specifically, the plaintiff expressly admitted that she terminated[17] her relationship with the defendant after their last meeting on February 25, 2000, because she no longer had confidence in his abilities. She did not present any evidence indicating that she intended to return to the defendant's care in

---

[17] The plaintiff asserts on appeal that it is not clear precisely when or if the physician-patient relationship actually ended, because she never formally terminated the relationship, but, rather, simply stopped seeing the defendant. In light of the plaintiff's explicit admissions throughout the record that she terminated the physician-patient relationship in February, 2000, because she no longer had faith or confidence in the defendant's abilities, however, we conclude that such a claim is disingenuous at best.

Moreover, we repeatedly have recognized that there need not be a formal discharge in order to terminate a physician-patient relationship. See *Grey* v. *Stamford Health System, Inc.*, supra, 282 Conn. 751. Rather, "[t]he determination of whether the physician-patient relationship has terminated depends upon several factors. These factors include the subjective views of the parties as to whether their relationship had terminated; the length of their relationship; the frequency of their interactions; the nature of the physician's practice; whether the physician had prescribed a course of treatment for or was monitoring the condition of the patient; whether the patient was relying upon the opinion and advice of the physician with regard to a particular injury, illness or medical condition; and whether the patient had begun to consult with another physician concerning the same injury, illness or medical condition." *Blanchette* v. *Barrett*, supra, 229 Conn. 278.

In the present case, the evidence indicates that the plaintiff believed that the relationship had been terminated in February, 2000; the parties did not engage in any direct interaction at any time thereafter; and the plaintiff consulted with other physicians concerning her condition almost immediately after she stopped seeing the defendant. Accordingly, we conclude that there is no genuine issue of material fact that the relationship had in fact been terminated in February, 2000, and, therefore, that the plaintiff's claim to the contrary is without merit.

the future,[18] or that the parties had agreed that the defendant would provide ongoing monitoring of the plaintiff's condition, despite the fact that the plaintiff had terminated their relationship. Moreover, the evidence is undisputed that the parties did not have any substantial direct contact after their last meeting on February 25, 2000, and that the defendant did not thereafter provide any further treatment that the plaintiff was aware of. See footnote 14 of this opinion. Accordingly, because the plaintiff submitted no evidence to suggest the existence of a physician-patient relationship or ongoing course of treatment by the defendant after February 25, 2000, we conclude that the trial court properly determined that the continuing treatment doctrine did not toll the period of repose beyond that date.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[18] Indeed, Fusi stated in his deposition testimony that the plaintiff and the defendant did not talk to each other after she terminated their relationship, and that "she didn't want to hear about him."